### J. T. FARGASON CO. v. FURST.

### FURST v. J. T. FARGASON CO.

(Circuit Court of Appeals, Eighth Circuit. February 5, 1923.)

Nos. 6104, 6105.

1. **Landlord and tenant ☞254(3)—Lien given by state statute is inoperative after crop leaves the state.**

The lien given a landlord on the crop raised on the leased premises by the Arkansas statute is one which exists only by virtue of the statute, not by the common law or the law merchant, and is inoperative after the crop has left the state, under the rule that a statute of the state has no extraterritorial effect.

2. **Bills and notes ☞83—Conditional acceptance of demand draft after refusal to pay must be in writing.**

After a demand draft had been dishonored by refusal to pay on presentation, it may be the subject of a qualified acceptance upon condition; but such acceptance, in order to bind the drawee, is required to be in writing by Thomp. Shan. Code Tenn. § 3516a.

3. **Estoppel ☞86—Drawee held not estopped to deny acceptance of draft.**

Where the drawee of a draft for the rent of leased premises stated to the payee his reason for disregarding the draft was that the tenant had not shipped him enough cotton to pay it, and in answer to a question when there would be enough cotton replied, "Eight or ten days," his statement was not sufficient to warrant the payee in believing that the draft would be paid when the cotton was shipped, so

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

as to estop the drawee from denying he accepted the draft after the payee, relying on that statement, had failed to assert his statutory lien on the cotton.

**4. Estoppel ⬤83(1)—Statement must warrant belief acted on.**

In order that the representations on which another party relied to his prejudice may be the basis of equitable estoppel, it is necessary that they must in themselves be sufficient to warrant the action taken, and their sufficiency is a judicial question; it not being enough that the other party deemed he was warranted in acting on them.

**5. Courts ⬤366(18)—Construction of state lien statute by state court is conclusive, if crop is delivered to purchaser within the state.**

The construction of Crawford & Moses' Dig. Ark. § 6889, giving the landlord a lien on the crop grown on the rented premises, by the Supreme Court of the state as creating a lien superior to a mortgage put on the crop by the tenant, and entitling the landlord to recover, in an equitable proceeding, the value of the crops, from a purchaser who had notice of the lien, is binding on United States courts, so long as the crop remained within the state, and if it was purchased and delivered to the purchaser within the state during the life of the lien.

**6. Landlord and tenant ⬤252(1)—Measure of damages to landlord for conversion of cotton crop.**

One who converted a crop of cotton to his own use with notice of the landlord's senior lien is liable to the landlord for the fair and reasonable market value of the cotton at the time and place of such conversion, to the extent of the landlord's lien, with interest, and if there was no market at the place of conversion the landlord is entitled to the value at the nearest market, less the expenses of transportation.

**7. Landlord and tenant ⬤252(1)—Crop held to have been delivered by tenant to purchaser within the state, and latter liable to landlord.**

Even though delivery to a carrier for shipment to a factor is not delivery to the factor at the point of shipment, it is delivery to him where, in addition to being a factor, he held a mortgage on the crop which entitled him to sell the crop and apply the proceeds to the payment of his mortgage, so that, where such delivery to a carrier was made within the state in which the crop was grown, the purchaser was liable in that state for conversion, if he had notice of the landlord's lien under the state statute.

Appeals from the District Court of the United States for the Eastern District of Arkansas.

Suit in equity by H. A. Furst against the J. T. Fargason Company, begun in the state court, and removed to the United States District Court. Judgment for plaintiff for part only of the amount sued for, and both parties appeal. Judgment reversed on defendant's appeal, and reversed and remanded, with directions to render judgment for plaintiff, on plaintiff's appeal.

B. J. Semmes, of Memphis, Tenn., for plaintiff.

James R. McDowell, of Memphis, Tenn., and John M. Moore, W. B. Smith, J. Merrick Moore, and H. M. Trieber, all of Little Rock, Ark., for defendant.

Before LEWIS, Circuit Judge, and BOOTH and FARIS, District Judges.

FARIS, District Judge. These are cross-appeals, taken in the same cause, which for brevity and convenience were considered together and

will be disposed of in a single opinion. The facts are fairly simple and practically undisputed as to salient points, with one exception, subsequently adverted to herein. For the sake of brevity, appellee-appellant H. A. Furst will hereinafter be referred to as Furst, and appellee-appellant J. T. Fargason Company will be called Fargason Co.

Furst, being the owner of the Turnage Place, a farm situated in Mississippi county, Ark., rented this farm for the crop year of 1920 to W. W. Driver and W. S. McAdams, at an agreed rental of $6,000, for the cultivation thereon of cotton. This rent became due about November 1, 1920. The Fargason Co. was engaged in business in 1920 in Memphis, in the state of Tennessee, as a cotton factor, and had been so engaged prior thereto for many years. In March, 1920, Driver and McAdams borrowed $6,000 from the Fargason Co., to be used in making the crop. Later on, and in July, 1920, a further sum of $2,500 was borrowed. These loans were evidenced by notes of Driver and McAdams, and were secured by a mortgage on the growing crop of cotton, which mortgage was duly recorded in the county of Mississippi, whereat Driver and McAdams resided and the crop was being grown. This mortgage is not set out in hæc verba in the record, but some reference to its terms appears in the testimony of the witnesses, and a brief statement of its contents is found in the record, wherein it is said that it—

"contained an agreement to ship all the cotton grown on the Turnage place in 1920 to Fargason Co., for sale as commission merchants, the net pounds (proceeds?) thereof to be applied to the indebtedness therein secured. It also recited that the said crop was to be grown on land rented from H. A. Furst. Besides the crop, there were also eight mules and a lot of farm implements conveyed in said mortgage."

Eighty-nine bales of cotton, being the same mentioned by Furst in his petition, which were grown in 1920 on the Turnage place by Driver and McAdams, were shipped by boat from Mississippi county, Ark., to Fargason Co., and by it received and sold, and the net proceeds thereof applied by the latter on its mortgage. No part of the $6,000 due Furst as rent has been paid. He sues to have his lien for rent established under the statutes of Arkansas, and for the value of the 89 bales of cotton alleged to have been unlawfully converted by Fargason Co. to its own use.

The case was begun on the equity side of the chancery court of Crittenden county, Ark., and removed thence to the federal court for the Eastern district of Arkansas, where it was tried as a suit in equity, and judgment rendered for Furst for $3,000 and interest, from which judgment both parties, as already said, have appealed.

The judgment below represented the amount of a draft for $3,000, drawn about November 24, 1920, but bearing date of December 3, 1920, by Driver and McAdams on Fargason Co., in favor of Furst, in part payment of the rent due Furst. This draft was first presented to Fargason Co., by a local bank, through which, it is assumed, Furst endeavored initially to collect it. Payment being refused, Furst presented the draft in person about December 5, 1920, to Fargason Co. What then took place is the matter of keen contradiction, heretofore

mentioned. Furst says that Fargason Co. told him "there wasn't enough cotton to pay the draft—I asked him when there would be, and he said, 'I don't know, maybe eight or ten days.'" About ten days later, Furst again went to Fargason Co., and was told again that "there wasn't enough cotton sold." Again a third time, taking with him a list of the 79 bales, which had then been received by Fargason Co., he went and demanded payment, and was made to "believe there wasn't enough cotton sold to pay the draft." Later, and about February 10 or 15, 1921, he was told by Fargason Co. that it would not pay the draft, because Driver and McAdams owed it money.

D. B. Fargason, testifying for Fargason Co., says that he told Furst, when the latter presented the draft of November 24th, that "we could not pay the draft; that McAdams had not shipped us enough cotton to cover his account. I told him that, if McAdams shipped us enough to cover the account and over, we would pay the draft. I never at any time stated to him that we would pay the draft or stand for the rent in any way." In this statement the witness is in all substantial respects corroborated by D. B. Fargason, Jr. After all this transpired, and on March 2, 1921, Furst was given another draft, drawn on Fargason Co., by Driver and McAdams, for $3,000, the balance due on rent. Payment on this, it is everywhere conceded, was refused unequivocally and promptly.

Upon this testimony, and from inferences drawn from the subsequent acts of the parties, the court below found that Fargason Co. declined to pay the first draft on the sole ground that it had not sold sufficient cotton to pay the amount thereof, but led Furst to believe that it would pay it, when enough cotton of the tenants had been sold to cover the draft, and as a matter of law concluded that this was so far a promise to pay as that, when Furst, relying thereon to the extent that he took no steps to enforce his lien as a landlord under the statutes of Arkansas, then open to him, was entitled to recover the amount of that draft. The Fargason Co. appeals, for that the trial court erred in permitting Furst to recover such sum of $3,000, or any sum, while Furst appeals because he failed to recover the full amount of his claim for rent.

[1] It is insisted, but not very strenuously, by Furst, that his landlord's lien (which will hereinafter be more specifically mentioned), as such, given by the Arkansas statute, followed the cotton and bound it, even after it reached Tennessee. This contention cannot be upheld. This lien arose solely perforce a statute local to Arkansas—not, of course, local, in the sense that no other state has it—but in the sense that a lien is not given by the common law, or by the law merchant, but comes into existence only when a statute creating it is enacted. The rule is general that a statute of a state has no extraterritorial effect, and that it operates only within the boundaries of the state which enacts it. Wilkinson v. Leland, 2 Pet. 627, 7 L. Ed. 542; McCool v. Smith, 1 Black, 459, 17 L. Ed. 218. Of course, this general rule is merely of value here by analogy. But the ruled cases and the textwriters seem to agree that a landlord's lien created by a state statute has no extraterritorial force. Millsaps v. Tate, 75 Miss. 150, 21 South.

663; 24 Cyc. 1259; 16 R. C. L. 989; 19 Am. & Eng. Encyc. of Law, 24; Underhill, Landlord & Tenant, 1446; Jones on Liens, 103; Marsh v. Ellsworth, 37 Ala. 85. We think the learned trial court was correct in holding that the landlord's lien statute of Arkansas was inoperative in the state of Tennessee.

[2] Fargason Co. contends that liability to pay the draft drawn on it by Driver and McAdams could accrue only by reason of an acceptance thereof by Fargason Co., and that since the Negotiable Instruments Law then in force in the state of Tennessee required acceptances to be in writing (Shannon's Code 1917, § 3516a), and since confessedly there was no acceptance in writing, there can be no liability on this draft in favor of Furst. This draft, which is not in the record, seems to have been a sight draft, postdated as of December 3, 1920. It was due then, when presented. No written acceptance was then necessary, for payment would have constituted acceptance. But if, as it seems, it had already been actually dishonored by presentation by a bank and a refusal to pay, it could nevertheless, after dishonor, have been the subject of a qualified acceptance upon condition; that is, qualified as to time of payment, as in eight or ten days, and conditioned upon the receipt in the meantime of enough cotton to pay it. See Shannon's Code, Negotiable Instruments Law. But such an acceptance, in order to bind Fargason Co., would, it seems, have to be in writing. Shannon's Code, § 3516a, supra. So much is said in order to accentuate the notion that the figure cut in this suit by the draft is wholly incidental.

[3] Clearly then this contention of Fargason Co. might be so far correct as to be decisive of the point, if the action were one upon the draft. But it is not such a suit. It is a suit to establish a lien, and thereupon to charge Fargason Co., as a junior lienor, for the conversion of property on which a prior and senior lien existed. The liability was fixed upon Fargason Co. by the trial court seemingly upon the theory of estoppel; that is, that Fargason Co., being advised and having notice of the lien of Furst as a landlord, and of his ability, so far as concerned *the cotton then still in Arkansas*, to enforce such lien against this cotton, made representations to Furst which caused the latter to forbear action on his lien to his hurt, and therefore Fargason Co. will not be permitted to deny a promise to pay so much as represented the value of this cotton.

What Fargason Co. said on this point, and of what these representations consisted, has been set out already. All that Fargason Co. said was, "There wasn't enough cotton to pay the draft," and, being asked when there would be, replied that it "did not know, maybe in eight or ten days." This, Furst says, is all that was said by Fargason Co. From this he says he was made to believe that Fargason Co. was going to pay the draft. This is a mere conclusion drawn by Furst. It is not a question as to whether he was made to believe a fact; the question is whether the language used by Fargason Co. warranted this belief on his part.

[4] Equitable estoppel is bottomed upon the notion that, when one person makes representations to another which warrant the latter in acting in a given way, the one making such representations will not be

permitted to change his position when such change would bring about inequitable consequences to the other person, who relied on the representations and acted thereon in good faith. Williams v. Neely, 134 Fed. 1, 67 C. C. A. 171, 69 L. R. A. 232. The representations made must be in themselves sufficient to warrant the action taken, and their sufficiency is a judicial question. It is not enough that the person who heard them deemed that he was warranted in acting as he did; the language used ought of itself to furnish the warrant. One man might consider himself warranted in acting upon representations wholly insufficient to move a more careful and prudent person. There must be present, moreover, all the usual elements of estoppel. Obviously other elements of estoppel are lacking, but, regard being had to the conclusion reached on the consolidated case, no necessity exists to further follow this question. In passing, it may be added that Furst had either actual or constructive knowledge of every fact within the knowledge of Fargason Co., and that, if at this time Furst intended to forbear proceeding against the cotton then in Arkansas, he did not advise Fargason Co. of this intention.

If, then, the situation be tested by the law of estoppel, we do not think the language used by Fargason Co., even when aided by the facts and circumstances, is sufficient to bind Fargason Co.; if it be tested by the law, which makes forbearance to use a legal remedy open to Furst a consideration moving in Fargason Co. for a promise to pay this rent, it is not sufficient for the lack of any promise by Furst so to forbear, and, if it were (and we think it cannot be), tested by the Negotiable Instruments Law of Tennessee, touching acceptances of foreign bills of exchange, then the lack of an acceptance in writing precludes recovery on this theory. It follows that the view taken by the learned trial judge in holding Fargason Co. liable to pay the first draft for $3,000 is in our opinion erroneous.

[5] Coming, now, to the appeal of Furst, for that the court below erred in not rendering judgment in his favor for the full amount of the net proceeds of the 89 bales of cotton: Furst had a lien on these 89 bales of cotton, so long as they remained in Arkansas. This lien was given him by a statute of Arkansas which provides that:

"Every landlord shall have a lien upon the crop grown upon the demised premises in any year for rent that shall accrue for such year, and such lien shall continue for six months after such rent shall become due and payable." Section 6889, Crawford & Moses' Digest.

Construing this statute, the Supreme Court of Arkansas holds that this statutory landlord's lien is superior and prior to a mortgage put upon the crop by the tenant. Meyer v. Bloom, 37 Ark. 43; Buck v. Lee, 36 Ark. 525; Watson v. Johnson, 33 Ark. 737; Lambeth v. Ponder, 33 Ark. 707; Tomlinson v. Greenfield, 31 Ark. 557. Likewise it is settled that in Arkansas a landlord may recover from the purchaser in an equitable proceeding the value of the crops grown on demised land, when such crops are purchased during the life of the lien by one having notice of such lien. Jacobson v. Atkins, 103 Ark. 91, 146 S. W. 133; Murphy v. Myar, 95 Ark. 32, 128 S. W. 359, Ann. Cas. 1912A, 573; Judge v. Curtis, 72 Ark. 132, 78 S. W. 746. And in such

case knowledge of any facts, sufficient to put the purchaser upon inquiry, which, if made, would disclose the existence of the lien, is held to constitute notice thereof. Jacobson v. Atkins, supra; Neal v. Brandon, 70 Ark. 79, 66 S. W. 200; Bank v. Meyer, 56 Ark. 499, 20 S. W. 406.

Here Fargason Co. admits that it knew that the cotton in question had been grown on rented land, and that it "naturally presumed that the landlord had a lien on the crop." This statute of Arkansas, and the interpretation put upon it by the Supreme Court of Arkansas, are binding upon this court, touching the nature and duration of the lien, the relative rights as between the landlord and a purchaser of the crop, and the constituent elements and nature of the necessary notice, *so long as the crop remains in Arkansas,* and likewise, if it be purchased and delivered to the purchaser in Arkansas, during the life of the lien.

[6] As already seen, the lien of Furst upon the cotton grown on the demised premises, while the cotton remained in Arkansas, was superior to the lien created by the mortgage held thereon by Fargason Co. If, then, Fargason Co. converted this cotton to its own use in Arkansas, with notice of the landlord's lien thereon, it is liable to Furst, the senior lienor, for conversion (25 Corpus Juris, 591), and Furst ought to recover the fair and reasonable market value of the cotton at the time and place whereat such conversion occurred. Such recovery should, of course, be limited to the sum of $6,000 and interest. If there was no market for the cotton, at the place of conversion, then Furst is entitled to have such value determined at the next·nearest place where there is a market, less the expenses of transportation to such latter place.

Clearly there was a conversion by Fargason Co., in the sense that it took the 89 bales of cotton, sold them, and applied the whole proceeds to the payment of its own mortgage debt. If this conversion took place in Memphis, Tenn., it occurred at a time and place, as has already been said, where by territorial limitations the landlord's lien had expired, and Fargason Co. would not be liable. If it occurred in the state of Arkansas, the Arkansas laws apply in toto, and Fargason Co. is liable.

It is not necessary to discuss, or decide in determining the situs of the conversion as between the contested points of Turnage Landing, in Mississippi county, Ark., and Memphis, Tenn., where and when delivery occurred upon the facts, to Fargason Co., *if and when the latter is regarded as merely a cotton factor.* It might be conceded, for the sake of the argument, that delivery of cotton by the owner and consignor to a common carrier for shipment to a factor would not ordinarily constitute delivery to such factor. 25 Corpus Juris, 393.

[7] But here Fargason Co. was not merely a factor, but it was a factor coupled with the interests, not only of having made advances on the cotton, but also of holding a mortgage thereon. The mortgage held by Fargason Co. bound the tenants to ship all cotton grown by such tenants on the Turnage place, in the year 1920, to Fargason Co., the net proceeds thereof to be applied in payment of advances, which advances were secured by a mortgage. Touching this situation—even aside from the mortgage, which furnishes an additional and stronger

reason for the rule—it is said in 25 Corpus Juris, 393 (citing numerous cases) thus:

"Where the consignment to the factor is made in pursuance to an agreement between the principal and the factor, and in pursuance of which the factor has made advances to the principal on the faith of the consignment, the delivery to the carrier of the goods consigned to the factor, and with the intent to comply with the agreement, gives to the factor a lien upon the goods from the time of such delivery."

There can be no question upon the record here that this cotton was shipped by the tenants to Fargason Co., with the intent to comply with the agreement contained in the mortgage that Fargason Co. should take the cotton and sell it and pay itself for advances made. That it was also the intent, as the record likewise clearly shows, that Fargason Co. should pay the rent, when it had paid itself, cannot change the rule, that a delivery of the cotton to the boat in Arkansas was a delivery to Fargason Co. in Arkansas. The facts that the shortness of the crop and the low price of cotton, interfered with this latter intent and obviated its consummation were mere fortuitous circumstances, which likewise cannot militate against the rule. We conclude that there was a delivery of the cotton to Fargason Co., in the state of Arkansas, and consequently a conversion by it of such cotton in Arkansas. It follows that the judgment below was wrong, in the appeal of Furst.

Some difficulty has been met in the case in applying the law to the pleadings and evidence, from the fact that it seems to present, both by the pleadings and the evidence, a case cognizable on the law side. In the state courts of Arkansas, it seems to be the rule and the practice to try such a case as this on the equity side. Murphy v. Myar, 95 Ark. loc. cit. 37, 128 S. W. 359, Ann. Cas. 1912A, 573. This case was so begun in a state chancery court, and when removed thence to the federal court was there tried, by common consent and without objection, as an equity suit. Likewise it was so presented and heard here, so we see no reason to travel afield, and thus borrow trouble, in order to discuss a question nowhere mooted.

Since Fargason Co. ought not to be charged with any sum greater than the fair and reasonable market value of this cotton, as of the time and place whereat it was converted, conditioned as already said, and since such value does not appear in the record, it ought to be reversed and remanded, with directions to ascertain such value and to render judgment therefor in favor of Furst.

Case No. 6104, reversed.

Case No. 6105, reversed and remanded, with directions.